## THE BURMA.

### (Circuit Court of Appeals, Second Circuit. April 10, 1911.)

### No. 210.

**1. ADMIRALTY (§ 66*)—PLEADING—AMENDMENT OF LIBEL.**

In a suit by a charterer against the owner for deceit in making a false representation in the charter party, libelant was not entitled to amend the libel, to charge that the representation was a warranty, on the trial, after a large amount of testimony had been taken on the cause of action originally stated.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 519–538; Dec. Dig. § 66.*]

**2. SHIPPING (§ 51*)—CONSTRUCTION OF CHARTER PARTY—INJURY TO VESSEL.**

A provision in a charter party, requiring the owner to maintain the vessel "in a thoroughly efficient state in hull, machinery, and equipment for and during the service," is broken, where the machinery of the vessel is disabled or rendered inefficient during the voyage through the inability of the engineers to properly use the coal furnished by the charterer, which was of the kind commonly used by steamers trading to the ports where it was supplied; nor is the owner exempted from liability for such breach of contract by a further provision mutually excepting, among other things, "all dangers and accidents of * * * steam navigation and errors of navigation," the exception in relation to steam navigation not including the results of negligence or incompetency of those in charge of the navigation.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 203–210; Dec. Dig. § 51.*]

**3. SHIPPING (§ 51*)—CHARTER—CONSTRUCTION.**

The fact that the charterer of a steamer is required by the charter to furnish the coal does not make the engineers and fireman using it his servants.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 203–210; Dec. Dig. § 51.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. Shipping (§ 58*)—Charter—Liability of Owner for Failure to Make Speed.

Evidence considered, and *held* insufficient to establish that the inability of a steamer to make her usual speed, or that which the charter stated she could make, was due to the impairment of her boilers or machinery, because her engine crew did not know how to handle the coal used.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 58.*]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by George L. Duval and others against the Steamship Hamilton Company, Limited, and the steamship Burma; F. J. B. Crowder, claimant. From a decree dismissing the libel and cross-libel, libelants appeal. Affirmed.

This is a libel filed by the charterers and a cross-libel by the owners, arising out of a charter party of the British steamer Burma for two round voyages (the second of which was canceled under an option) from the United States to a port or ports on the west coast of South America and return. The District Judge dismissed both libels and the charterers appealed.

Henry W. Rudd (Charles C. Burlingham, S. P. Henshaw, and N. B. Beecher, of counsel), for appellants.

J. Parker Kirlin and Charles R. Hickox, for appellee.

Before LACOMBE, COXE, and WARD, Circuit Judges.

WARD, Circuit Judge. The first cause of action in the libel was for deceit, charging the owners with making the following representation in the charter party knowing it to be false:

"Owners represent that the steamer under ordinary conditions and laden will steam on an average about ten knots per hour on about 24 tons of best Welsh coal."

[1] The District Judge, without passing upon its truth or falsity, found that the owners made the representation in entire good faith. At the trial the charterers asked leave to amend the libel by adding an article charging that this representation was a warranty. This was refused, on the ground that it was too late to introduce a new cause of action after a large volume of testimony had been taken upon the cause of action for deceit originally set up. We concur with the District Judge upon both points.

[2] The second cause of action is for a breach of the following covenant in the charter party:

"1. That the owner shall * * * maintain her in a thoroughly efficient state in hull, machinery, and equipment for and during the service."

The answer says on this subject:

"Tenth. Further answering, the claimant and the respondent allege that, while the vessel was in the service of the libelants during the period of the charter above referred to, the libelants supplied to the vessel certain quantities of coal to be used and that actually were used in the vessel's furnaces. This coal was not best Welsh coal, nor was it equivalent in efficiency to best

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Welsh coal. It was of a highly gaseous and flaming nature, it was dirty and impure, and it formed heavy clinker in the furnaces. Its use in the furnaces resulted in fire in the uptakes, funnel, and smoke boxes. It buckled the smoke box doors, and caused them to leak, and interfered with the proper working of the system of forced draft. The use of the coal also subjected the furnaces to extraordinary and improper strain, and resulted in an impairment of their condition to such an extent that on the arrival of the vessel at New York, on the return from the west coast of South America, where she had proceeded under orders from the libelants, the surveyor to the British corporation in which the vessel was classed required that the furnaces should be entirely renewed to enable the vessel to retain her class. In consequence thereof, the owners of the vessel were obliged to replace the furnaces and incurred other expenses in the sum of approximately $25,000. This result was wholly caused by, and directly due to, the wrongful and improper action on the part of the libelants in supplying to the vessel coal of bad and improper quality, in violation of their undertaking to furnish to the vessel coal of fit and proper quality."

The owners filed a cross-libel against the charterers to recover damages to furnaces, uptakes, smoke box, and funnel so caused. The coal complained of was Coronel coal, found upon the west coast, and commonly used by steamers trading there. The owners understood that such coal would be supplied there by the charterers. Upon the return of the steamer to New York after the first voyage her furnaces were condemned and the owners compelled to put in new ones.

The District Judge was of opinion that the efficiency of the Burma's machinery was impaired, and her furnaces, uptakes, smoke box, and funnel injured, because the engine department did not know how to use Coronel coal which is highly gaseous and inflammable. But he thought that the provision of the charter party above quoted did not cover such negligence, and that the charterers' only remedy was under clause 10, which reads:

"10. That if the charterers shall have reason to be dissatisfied with the conduct of the captain, officers, or engineers, the owners shall, on receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments."

Accordingly he dismissed both libel and cross-libel.

We cannot agree to this construction of the charter party. If the machinery had been destroyed and the purpose of the voyage frustrated by the negligence of the engineer, it could hardly be said that the owners' covenant to keep her in an efficient state while on the voyage had been fulfilled. The faculty of demanding a change of appointments is an additional privilege to the charterers, but no remedy whatever for the consequences of negligence of the owners' servants occurring at sea. The right of charterers to recover in such cases is recognized in Omoa, etc., Co. v. Huntley, 2 C. P. D. 464, and Weir v. Union Steamship Co. [1900] A. C. 525.

[3] Neither can we agree with the owners' contention that, because the charterers were bound to supply the coals, the owners' servants in the use of them were acting as the servants of the charterers. Such a conclusion is against all reason. A master is one who can say to this man, "Go," and he goeth, and to another "Come," and he cometh, and to another, "Do this," and he doeth it; but the charterers had no control whatever over the engineers or firemen. Engineers are as much

the servants of the owners as the master is in the navigation of the vessel.

The owners further contend that they are exempted from liability by the seventeenth article of the charter:

"17. * * * The acts of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the seas, rivers, machinery, boilers and steam navigation, and errors of navigation, throughout this charter party, always mutually excepted."

This clause presents, we must suppose advisedly, a sharp contrast between "steam navigation" and "navigation." In the former "dangers and accidents" are excepted which, in the absence of express provision to the contrary, cannot be held to include the results of negligence. If the provision had been, as in the case of navigation, "errors of steam navigation," the conclusion might be different. Our decision in Clyde Steamship Co. v. West India Steamship Co., 169 Fed. 275, 94 C. C. A. 551, contains nothing inconsistent with these views.

The decision in McFadden v. Blue Star Steamship Co. [1905] 1 King's Bench, 697, to which we are referred by the proctor for the owners, is not applicable. The covenant in that case was as to the condition of the vessel at the time of loading, and was not continuous, as is the one now under consideration.

[4] .We are not at liberty to infer, from the mere fact that the steamer failed to make as good time as she usually did, or as the charter stated she could make, that her boilers or machinery were inefficient. There were other causes, as, for example, the extreme foulness of her bottom, head winds, currents, etc., which might account for it. The use of Coronel coal, by men who did not know how to handle it, probably did injure the furnaces. But the question remains, did the injury to the furnaces impair the Burma's steaming capacity? The chief engineer testifies that the boilers were able to maintain the steam pressure of 170 pounds, usually carried, and an examination of the engine room logs shows that on the return trip between Montevideo and Baltimore, although the Burma was making only between 7 and 8 knots, the boilers carried that pressure, giving to the H. P. cylinder 170 pounds, to the Int. 44 pounds, and to the L. P. 9 pounds. We reach the same conclusion upon this cause of action as the District Judge, but upon a different understanding of the facts.

Decree affirmed, with interest and costs.